# TRANSCRIPT OF DECEMBER 6, 2007 FULL AND HEARING

FULL AND FAIR HEARING APPEALS BOARD

In the Matter of: :

LCDR Sharon L. Myrick :

:

:

______________________________ :

ORIGINAL

Thursday, December 6, 2007

**Panel Members:**

Captain William B. Baine
Captain Eric M. Wassermann
Captain Steven S. Wolf

**Medical Advisors:**

Captain Vito Caserta
LCDR Nicole Chamberlain

**Appellant:**

Sharon L. Myrick

**Appellant's Attorney:**

Wendell C. Robinson
Leonard L. Long, Jr.

P R O C E E D I N G S

(Time noted: 9:44 a.m.)

CAPTAIN BAINE: I am CAPT William B. Baine, President of this Appeals Board, and hereby call to order this Full and Fair Hearing in the case of LCDR Sharon L. Myrick. The date is December 6, 2007 and the time is 9:44 a.m.

This Full and Fair Hearing is convened as provided for in law at the request of LCDR Sharon L. Myrick who is appealing the decision of the Medical Review Board of October 16, 2007. That Board found the officer not fit for duty. I will not quote the report of that Board, since the report has been included in the record of this hearing.

A copy of the packet provided for the Full and Fair Hearing (FFH), of the Medical Review Board Report and subsequent records in this case, was made available by the Medical Affairs Branch to the officer in advance of this hearing. Copies of the same documents and the copy of the officer's statement of appeal were made available to the members of this Board in advance of this hearing. These materials will be submitted for inclusion in the record. The officer's central medical file is available to the Board in this Board room.

According to the record, Mr. Leonard L. Long, Jr., and Mr. Wendell C. Robinson, attorneys for the appellant, indicated by e-mail that both of them would be physically present at this Hearing and that LCDR Myrick would be present by conference call. For this reason the Medical Affairs Branch has elected to arrange for the services of a court stenographer to record these proceedings.

A transcript of these proceedings, of the Medical Review Board's findings, and of the findings of the December 6, 2007 Full and Fair Hearing(FFH) will be submitted to the Acting Surgeon General for final action.

I will now ask Dr. Wassermann to administer the oath to me.

CAPT WASSERMAN: Dr. Baine, would you raise your right hand, please? Do you affirm that you will discharge your duties honestly and fairly in the matter before this Board?

CAPT BAINE: I do.

CAPT BAINE: I will now administer the oath to the other Board members.

Dr. Wassermann, will you raise your right hand, please? Do you affirm that you will discharge your duties honestly and fairly in the matter before

this Board?

CAPT WASSERMAN: I do.

CAPT BAINE: Dr. Wolf, will you raise your right hand, please? Do you affirm that you will discharge your duties honestly and fairly in the matter before this Board?

CAPT WOLF: I do.

CAPT BAINE: I will now ask the Board members to introduce themselves, to give their professional qualifications and present assignment of duty station. I will begin with myself.

I am Capt William B. Baine. I am a physician with board certification in Internal Medicine, Infectious Disease and Geriatric Medicine. I am a Senior Medical Advisor at the Agency for Healthcare Research and Quality, Department of Health and Human Services (HHS) in Rockville, Maryland.

Dr. Wassermann?

CAPT WASSERMAN: I am Capt Eric M. Wassermann. I am board certified in Neurology. I am a medical officer at the National Institutes of Health, National Institutes of Neurological Disorders/Stroke, Division of Intramural Research, Clinical Neurosciences Program, Health and Human Services in Bethesda, Maryland.

CAPT BAINE: Dr. Wolf?

CAPT WOLF: I am Capt Steven S. Wolf. I am a physician with board certification in Neurology. I am a medical officer at the U.S. Marshall Service Headquarters, Department of Justice in Washington, D.C.

CAPT BAINE: Thank you. I would also like to introduce Capt Vito Caserta who is the Senior Medical Evaluations Officer for the Medical Affairs Brand and LCDR Nichole Chamberlain who is the Nurse Medical Evaluations Officer. Capt Caserta and LCDR Chamberlain are here to be available for answering inquiries by the Board regarding procedural matters. They are not members of the Board and will not participate in the deliberations of this Board.

LDCR Myrick, this is Capt Baine, President of this Full and Fair Hearing. I understand that Dereke Williams was informed by e-mail that you were not requesting to address the Board in person, but by speakerphone. Are you willing to answer questions via telephone put to you by this Board?

LCDR Myrick: Yes, I am.

CAPT BAINE: In that case, LCDR Myrick, do you affirm that you will tell the truth, and nothing but the truth, in the statements and answers you make

before this board?

LCDR Myrick: Yes.

CAPT BAINE: For the record, LCDR Myrick, please state your rank, your full name and your duty station?

LCDR Myrick: LCDR Sharon L. Myrick. New York Regional Office, OPR.

CAPT BAINE: Thank you.

Are you represented by Counsel, LCDR Myrick?

LCDR Myrick: Yes, I am.

CAPT BAINE: Counselors, may I ask you to state your name and address for the record?

MR. ROBINSON: Wendell C. Robinson. My address is 4308 Georgia Avenue, N.W., Washington, D.C. My zip code is 20011.

MR. LONG: For the record, I am Leonard L. Long, Jr. Address 1818 11th Street, N.W., Washington, D.C. Phone number there is (202) 234-5664.

CAPT BAINE: Counselors, do you plan to call LCDR Myrick as a witness on her own behalf?

MR. ROBINSON: Yes.

CAPT BAINE: In that case, LCDR Myrick, do you affirm that you will tell the truth and nothing but the truth in the statements and answers you make before this Board?

LCDR Myrick: Yes, I do.

CAPT BAINE: Counselors, do you have any reason to believe that any member of this Board may be unable to accord LCDR Myrick a fair and impartial hearing?

MR. ROBINSON: No, I do not. However, I will note for the record the absence of anyone in the particular professional expertise of Dr. Myrick as contentious.

CAPT BAINE: Counselors, you may proceed when the presentation of your case.

MR. ROBINSON: Thank you very much.

We will reserve an opening statement and move directly to the testimony that we will want to present in this case. However, we would note for the record that we would like made part of the record, and I assume it is, the statements of exceptions that we have submitted to the Board with respect to why we feel that the Board lacks the jurisdiction to enter into a decision based upon the fact that Dr. Myrick, prior to the Board entered, entered a letter of resignation indicating that she did not believe that she could fulfill her obligations and therefore, at that particular point, the Medical Board had no jurisdiction to make the determination of unfitness as

she had resigned.

In addition to that, we would make for the record that we have indicated in our record there was lack of substantial evidence to substantiate that at the time that Dr. Myrick began her active duty, that Dr. Myrick intentionally just failed to disclose information that would have disclosed a pre-existing condition. There is no evidence at all that Dr. Myrick either through verbal or written applications or any of the evidence that we have here, that demonstrates Dr. Myrick withheld any information and therefore, on the basis of that, we would move that the Board has no jurisdiction to proceed with this. They should have proceeded directly with the resignation of Dr. Myrick.

We will note that the court, of all of the documents that have been submitted here fairly substantiate the existence of a condition multiple sclerosis, that would indeed, based upon Dr. Myrick's letter indicate that she was unfit for service as a result of a medical condition that has been verified by a number of documents and in the Disability Evaluation Manual and in addition to the information you have submitted to us.

With respect to that, we would now move to

the testimony of Dr. Myrick, who has been sworn.

DIRECT EXAMINATION BY MR. ROBINSON:

Q Dr. Myrick, this is Wendell Robinson, good morning.

A Could you speak a little bit louder, please?

Q I will sure try to elevate.

Dr. Myrick, how long have you served in the United States Navy prior to joining the Service which you began in March of 2005?

A I was active duty when I finished my residency and this was probably 1986 through 1989. I was active duty Navy. And then I was active duty Reserve Navy in 2000.

Q Now, at the time that you, when you went to active in 2000, what was your health condition at that time?

A I am sorry, I think that was 2002.

Q Okay. At that particular time, how was your health?

A My health at that time was very good. I enjoyed a full physical life. I was swimming and running, and also I enjoy Salsa, so I was dancing on a regular basis. So, I had no, there was no problem.

Q Well, did you, did you ever take or participate in any Navy physical fitness tests?

A Yes, I did.

Q And, and what tests were they and please tell us what year that was?

A Each year that we are in the reserves, we have get a PT test, twice a year and the first test that I had to do was, I did the run test. That required me to have to run a mile and a half in a specific time, based upon your age. And on that particular test, I had an outstanding. It also required that you to do sit ups and push-ups. And the following year I decided to try the swim test since I was swimming pretty much every day. And I did the swim test. And it was outstanding on that one also.

Q Now when you performed these tests, is there a particular level that you are rated based upon your performance?

A Yes, you respond to a certain time distances.

Q Yes.

A That is when they either give you good, outstanding, that type of rating.

Q Okay. And what was your rating?

A For each test that I completed was outstanding.

Q Now, I direct your attention to the time you

started, according to the records here, that you began with your Public Health Service in March of 2005. Can you recall that time?

A Yes, I do.

Q And at the time you began your service, did you have to undergo a physical examination prior to an entry to a call of duty?

A Yes, I did.

Q And who performed that test, if you can recall?

A I had that test performed at the Veterans Administration Hospital here in Nashville, Tennessee.

Q Now were the results of that examination made available to the Public Health Service and yourself?

A Yes. And also since I was in the reserves, we had a physical examination done and we had to apply to, and there were different physical evaluations at reserve duty when we had, when I had my reserve time.

Q Yes.

A When I was in the Medical Branch.

Q Now, at the time your took your physical examination, other than the physical examination, itself, did you have to fill out any application that asked you series of questions concerning your medical

health condition and/or history?

A Yes.

Q And did you complete that form?

A Yes, I did.

Q And did you complete that form fairly and truthfully?

A Yes, I did.

Q And at any time did you fail to disclose any medical condition that you knew of that the Government or the Army or the Public Health Service would want to have known prior to you going on your call of duty?

A No.

Q Did anyone ask you any questions at the time of your examination about Multiple Sclerosis?

A No.

Q Did you suggest it to anyone as a result of an implied implication that a question was being asked in that area?

A No.

Q Did you have a chance to look at the medical report that was, the medical report that was taken of you prior to your call of duty in the Public Health Service?

A Yes.

Q And do you recall if the physician who

performed that test, indicated that you had symptoms of or reason to believe that you suffered from Multiple Sclerosis?

A No.

Q Was there anything in that report that indicated that based upon the physical tests, that you failed to disclose conditions that a pre-existing condition with your knees or Multiple Sclerosis was there and you failed to respond to those questions truthfully?

A No.

Q Now, the person that performed this examination, do you know the doctor's specialty?

A I believe that was Internal Medicine.

Q Now, now, prior to your call of duty, did you have to go into an interview with anyone? When you began to start your duty? Did you?

A No, I didn't have an interview.

Q Now, from the time you started, your active duty call, to the time that you submitted your letter indicating that you would have to resign because of physical conditions, did anyone ever ask you if you were suffering from Multiple Sclerosis and that, indeed, you failed to disclose that to them when you took your medical exam?

A No.

Q Now, what caused you to transfer to the Public Health Service? What were your reasons for doing that?

A My reasons were, for transferring were, I was given the opportunity to come to Hersure (ph), which I believed to be the ultimate is Public Health Service. And I think in an earlier letter I had written that since I had been out -- I have a cold, so I am sorry. I had been out working in Indian Health Service and I had been at many health centers mostly in many indistinct areas that I pretty much thought that I would be able to come to Headquarters, and I could be a part of some of the decision making processes of how things are done when you are out kind of in the trenches. Is that what they call it? And I wanted to be a part of that. I wanted to be able to share what I had learned as being out there in some of these areas that are very underserved.

One being on the reservations and the other in the innercity health centers. And the problems that I had as provider as far as resources and, you know, not enough providers.

To be able to see how, how decisions are made in doing that and how people are treated,

and to really make an impact. And to see the roles that other people play and even as far as recruiting others into the field, because I always found it to be very rewarding.

So, that was one of my dream jobs was to be able to come to Headquarters. And I looked at it as going to Headquarters for the Public Health Service.

I went back and got another Master's in Health Care Administration as well as Management to be able to, be able to contribute something, to not just come in as someone who had worked in the trenches, but, also have a specialty in my educational background to able to tie all these experiences that I have had together. And it was one of my dreams.

Q Now, were you instrumental on establishing any sites in the underserved areas while you were in the service?

A I did. I was able to establish a site at McHarry, for --

Q McHarry what, please be more --

A McHarry Medical College.

Q And where is that located?

A Nashville, Tennessee.

Q And it is affiliated, okay, go ahead.

A And I was able to establish at the sites for the National Health Care Corps for loan repayment, which is one of the biggest issues. And the reason that I did transfer from Indian Health Services to National Health Service Corps was at the time I had a humongous student loan. And Indian Health Service, when I was in, did not have a loan repayment site unless you went to like Alaska. So, I actually had gotten a site at Whitney Street (ph) in Boston, and when I got into that program, I thought, well, you know, here is my opportunity to be able to pay off my student loans. So, that was why I transferred from Indian Health Service to National Health Service Corps. Because I was able to get a loan repayment site.

Q Now at some point you felt, based upon your medical condition that you would be unable to fulfill your obligations with the Public Health Service, is that correct?

A Yes.

Q And you wrote them a letter indicating that, is that correct?

A Yes, I did.

Q Tell us how that affected you prior to you putting to paper, in the paper?

A Very sad.
Q What do you mean by that? Take your time.
A Well, probably because I know that I had a problem. But, I didn't focus on it. I tried to overcome whatever, because I felt like if you focus on something, it is going to beat you. So, I tried to go beyond and above probably. And I never gave in to M.S. I never gave into any symptoms, anything. I just kept going. And it was kind of like giving into it. Or maybe take it to another level that I never had been confronted before. It kind of made me feel like, here I had been in Public Health all these years, providing for people who were underserved or who had disabilities, who had had other problems and here I was in the same position, fighting for myself.
And that's hard, you know, when I was pretty much felt I was given all the advantages. I had basically the family and then to have to take a step back and say, okay I am now in maybe a position that I can't do as much as I did before. That is hard for me.
Q Would it be fair to say that you placed ahead of your medical condition the patients and other people that you would serve because you felt that your condition would prevent you from giving them 100

percent and that was very difficult for you to accept, but you had to do it?

A Yes, because I don't think I have ever been the type person that wanted to be looked at differently, or treated differently or not be able to keep a pace with everybody else, because I have always been kind of competitive, and kind of proud of all the accomplishments that I was able to do in spite of my diagnosis. And, you know, even today, I don't really talk about it. A lot of my friends never ever knew about it. No one knew because, you know, I was still able to do what I needed to do. And it was very hard for me to finally say, okay, I have to modify, but I didn't want to make myself worse and be in a worse position. And I knew that that was one of the things that could happen, but because I really liked what I was doing and because I think Public Health is a part of me, I could bear it.

Q Thank you very much.

MR. ROBINSON: Indulge us, please.

(Pause.)

BY MR. ROBINSON:

Q Dr. Myrick, that is all the questions I have for you, but if there is anything that you would like to say right now in about 30 seconds or a minute that

you would like the Board to know, please feel free to do so at this time.

A Okay. I just have one thing. I know when I was offered that opportunity to come to Rockville, I had discussed it with my family and my mother. I know one of her biggest concerns was that it might have been a big step for me, but, you know, I told her that I probably, I would be okay and I really wanted to do that because I think in the past I had looked at CDC, and that didn't work out. And I looked into some of the other work and this and that, and I think my family and all my friends pretty much were under the understanding that I was going to keep trying, so I could get to Headquarters this time, to make an impact on Public Health and it was just a part of who I am, I think I am. When I gave up my practice to go into it. And I don't regret it. I had a full career and I really enjoyed it.

MR. ROBINSON: Thank you very much.

MR. LONG: I have one question.

DIRECT EXAMINATION

BY MR. LONG:

Q Dr. Myrick, this is Leonard Long. How are you?

A Good morning.

Q Why do you think that your likeness was shown, was selected as a promotion for the Health Service Corp?

A The reason, number one, I had made many friends in Rockville. And these are not friends that I had when I first came to Hersure (ph), these are people that I had met along the way in Indian Health Service and at different Health Center meetings, National Health Service Corp meetings. And I think that they probably knew that I was pretty firmly committed to Public Health Service. And I became very close with Dr. Dushanka Kleinman, who was pretty much a mentor and I think when she, when I got to Rockville, she took on the role of somewhat mentoring me over, even though she was over at NIH and this is the year before she was getting ready to retire, so, I think that because of her and because of my commitment, even when I got to McHarry and beforehand, to Public Health Service, that I was recommended to participate in the Marketing Program. And I was very happy to do that, very happy to represent the Dental Corp. And I felt that, you know, I worked hard to be able to do that.

So, I think that was one of the things that they had known my reputation as a dentist and not only

from Navy but from my commitment with National Health Service Corp through dental students across the country and recruitment for different programs and residencies. I think I was a good person that they selected, because I had really recruited a lot of dental students from McHarry to enter into Indian Health Service and to Commission Corp and into the Navy. So, I think I was a good role model.

MR. LONG: Thank you.

CAPT CASERTA: I am not sure that the Board members understand the background for that question. I don't know that they know that her photograph was, you may want to bring that up.

CAPT BAINE: It is in the record.

CAPT CASERTA: Okay.

MR. ROBINSON: Yes, it is in the record. Right. Thank you. That is all the questions we have of Dr. Myrick at this time. We can proceed directly to our closing. Unless there is some other evidence that the Public Health Service that or the representatives here wants to refute the representations of Dr. Myrick concerning the issues at hand.

CAPT BAINE: Do the members of the Board have questions for this witness?

CAPT WOLF: Yes, I have a question.
LCDR Myrick?
LCDR MYRICK: Yes.
CAPT WOLF: This is Captain Steve Wolf. Hi.
LCDR MYRICK: Hello, sir.
CAPT WOLF: I was, I am a little confused about your answer to one of the questions posed by your attorneys, which is your answer about the completion of the physical exam, the actual medical report of the medical history dated October 16, 2004.
LCDR MYRICK: Okay.
CAPT WOLF: You stated you were in good health, you were not asked any specific questions about Multiple Sclerosis at the time. Did you, when you answered the questions, one of the questions specifically asks have you ever had or do you now have meningitis, encephalitis, or other neurological problems. Were you aware that at this time that you had Multiple Sclerosis?
LCDR MYRICK: In 2004, yes. I knew that I had M.S. at that point.
CAPT WOLF: And that Multiple Sclerosis is a neurological problem?
LCDR MYRICK: But, at that time, I didn't have any symptoms, anything.

CAPT WOLF: Right. But, it doesn't ask if you have symptoms at that time. It asks if you have ever had or do you now have. And I am just trying to understand how, how you interpreted that question?

LCDR MYRICK: I think, I guess what has worked for me, and I think I may have stated that earlier, was that I probably because I did not have any symptoms, and was pretty much living a full life, felt kind of that maybe this was really not true. I mean, that I didn't have this. And I didn't buy into saying, okay, you have this. So, if I were to be asked, I would say no, because I had no neurological symptoms.

CAPT WOLF: Although by, I guess, from my understanding in the record here, you were diagnosed with Multiple Sclerosis in 2000, is that correct?

LCDR MYRICK: Yes.

CAPT WOLF: And surely as a health care professional yourself, you must understand that Multiple Sclerosis symptoms can wax and wane and while they might, while you might not have been symptomatic at the time that you completed this report of medical history, aren't you aware that Multiple Sclerosis could reemerge at any time?

LCDR MYRICK: I think no, I probably didn't know, because I really didn't know that much about Multiple Sclerosis even when it was diagnosed. And pretty much I felt that, like most patients, probably think I don't have any symptoms. Just face it. So, I really didn't know what the symptoms were. I didn't know anybody who had had Multiple Sclerosis. No one in my family has had it. But, I didn't know what symptoms there were, and I didn't read at that time about a lot of it because I didn't want it to kind of get into my head that this is what this is. This is what, you know, this is what you are going to get.

CAPT WOLF: Right.

LCDR MYRICK: I am just being honest.

CAPT WOLF: I understand. I guess I am still somewhat perplexed because from what you are saying, I guess you felt that it wasn't necessary or important to mention it.

MR. ROBINSON: I will object. She didn't say it wasn't necessary. She said that she was unaware that she had it because it was asymptomatic at the time.

CAPT WOLF: Okay. Let me rephrase that as a question then.

If you felt it was important to mention that you had high blood pressure, but that it was only every now and then as you wrote, why wouldn't it have been important to also mention Multiple Sclerosis only every now and then?

MR. ROBINSON: Well, I am going to object as asked and answered. She had indicated previously that she was unaware she did not believe she had and she was asymptomatic. If she is asymptomatic and she believes she doesn't have it, there would be no reason for her to. However, please, answer the question, Dr. Myrick. Are you there?

LCDR MYRICK: Yes, I am here.

MR. ROBINSON: Yes, answer his question, please.

LCDR MYRICK: I am sorry?

CAPT WOLF: Do you want me to rephrase the question?

LCDR MYRICK: Yes, please.

CAPT WOLF: You did mention in your report of the medical history in one of your written responses, number 16(f) high or low blood pressure. You answered yes and then you wrote, high blood pressure, only every now and then. Which indicates that it was an intermittent problem not always

present. And my question, therefore, is why wouldn't you also mention Multiple Sclerosis as a problem, which was present every now and then?

LCDR MYRICK: To address that, I would answer that on most medical forms, it is stipulated that, written out, high blood pressure, which I checked off.

CAPT WOLF: So, again, under the number 15 where it asks, 15(h) meningitis, encephalitis or other neurological problem, you didn't --

LCDR MYRICK: I didn't because I didn't, I didn't see that as a problem. It hadn't been a problem.

CAPT WOLF: Okay. Thank you.

CAPT BAINE: Dr. Wassserman?

CAPT WASSERMAN: I don't have any questions.

MR. ROBINSON: Can I have a few redirect questions based on Capt Wolf's questions?

CAPT BAINE: Certainly.

MR. ROBINSON: Thank you.

REDIRECT EXAMINATION

BY MR. ROBINSON:

Q Dr. Myrick, after you filled these forms in October of 2004, did you take a Navy test in 2005?

A In 2005, let's see it should be here in my

notes.

Q Did you have to take a physical test after, after October 2004?

A When I was in the Commissioned Corp?

Q Yes.

A Yes.

Q And what did you have to do? What did that test consist of?

A I did run and also we had the physical fitness challenge. In Rockville, I participated in the President's Physical Fitness Challenge, which was logging in your daily activities for exercise.

Q Okay. Now, going back to Captain Wolf's question. You don't have it before you, but I am just going to read it to you. It is on the back of the form and it indicates Dr. Wolf's question was, with respect to 15(h) it says, "Have you ever had or do you now have" and then it lists. And then on 15(h) it says meningitis, encephalitis or other neurological problems and you checked no. At the time you checked no, did you have any reason to believe that that answer was untruthful, misleading or deceptive to the Public Health Service?

A No.

MR. ROBINSON: Thank you. Nothing further.

Excuse me, please.

BY MR. ROBINSON:

Q And did you pass that test that you took?

A Yes.

Q Okay.

A And I went up to the gold status for the President's Physical Fitness Challenge.

Q And what is the gold level, what does that mean?

A It starts with bronze, silver and then gold.

Q I see.

A And there is one more level I believe after the gold.

Q Now, Dr. Myrick, based upon the fact that it is in the record that your picture was displayed as a public reference to Public Health, your commitment to the Public Health, would you lie to get into the Public Health Service?

A No.

Q Thank you.

A I have always been in Public Health Service.

MR. ROBINSON: Thank you. I have no more questions of Dr. Myrick, unless someone else may have some.

CAPT BAINE: LCDR Myrick, this is Captain

Baine. First if I may, I would like to express my personal sympathy to you as a fellow commissioned officer, a fellow health professional and a fellow human being for you, with regard to the Multiple Sclerosis. I have read about how painful it has been, how uncomfortable it has been, how disabling it has been in both your personal life and in your job.

LCDR MYRICK: Thank you.

CAPT BAINE: I want to express that for the record.

LCDR MYRICK: Thank you.

CAPT BAINE: I have a question about your Multiple Sclerosis history. At some time you were treated with Interferon injections, is that correct, Avinex?

LCDR MYRICK: Yes.

CAPT BAINE: Do you remember when you first started taking the Avinex?

LCDR MYRICK: Yes.

CAPT BAINE: When was that, please?

LCDR MYRICK: That was in 2000.

CAPT BAINE: In 2000. And how long did you continue on that therapy?

LCDR MYRICK: I remained on that therapy until last July.

CAPT BAINE: July of last year or --

LCDR MYRICK: Of last year.

CAPT BAINE: Of 2006.

LCDR MYRICK: I am sorry.

CAPT BAINE: Okay. At the time you filled out the report of medical history, dated October 16, 2004, were you taking the Avinex at that time?

LCDR MYRICK: Off and on, yes.

CAPT BAINE: Okay.

LCDR MYRICK: And the reason I say off and on is because I had talked to a friend of mine who was diagnosed with M.S. and he had informed me of different therapies other than that.

CAPT BAINE: I see.

LCDR MYRICK: And I was looking into more herbal therapy. I was doing that. And I didn't see where it was, you know, making a difference one way or another. I just hated the injections.

CAPT BAINE: Did you have any side effects from the injections?

LCDR MYRICK: No, it is just mentally.

CAPT BAINE: I see. All right.

Do any other members of the Board have questions for this witness?

Counselors, do you have any further

questions for your witness?

MR. ROBINSON: No, we do not, Mr. President.

CAPT BAINE: Are there any more witnesses to be heard?

MR. ROBINSON: No.

CAPT BAINE: Is there any more evidence to be introduced?

MR. ROBINSON: We would move the introduction of all the medical records that have been submitted to us in the folder that are a part of the record. In addition to that our exceptions there. We would also move the introduction of the preset the Medical Board has been presented.

And I would also like to introduce for the record, although I know it is probably we have it, is Chapter 2.

CAPT BAINE: Can I get a copy for the Board members of that?

MR. ROBINSON: Yeah, they have it, yes. I am sorry. Disability Evaluation Manual for the Commissioned Corps of the United States Public Health Service. And I move the admission of Chapter 2 on page three, Requirements for Disability Retirement of Separation of Benefits, Subparagraph A, Fitness for Duty Determination, Subpargraph B, Service Incurred

for Aggravated, as part of that.

In addition to that, I would also like to have introduced Subpargraph C, Line of Duty, Subparagraph D, Approximate Result, E, Rate of Disability and F Disposition of Cases.

With respect to that, I would move right to closing.

CLOSING STATEMENT BY MR. ROBINSON:

MR. ROBINSON: This Board is here to review the findings that Dr. Myrick should be discharged and there should be no disability. And the Board was very specific in what it stated.

I will read that only because I just want to make sure that, and the record is clear.

This report is dated September 27, 2007. And I quote, "This Officer was recommended for separation since the onset of the condition of Multiple Sclerosis prior to her call to duty. This information is not disclosed as required at the time of her application and her call to duty. In addition, the Officer does not disclose other significant chronic conditions such as knee pain. In addition, at the time of her application, she withheld information, which would have established the preexistence of a disability condition."

At that the end of the report it states down there with respect to Multiple Sclerosis that the Board gave no disability, whatsoever. And with respect to the knee impairment, gave no disability, whatsoever. And the total combined disability the Board found was zero.

In this particular proceeding, the pre issue here is, I think is fairly substantiated by the medical evidence that has been submitted and documented in a number of medical reports by doctors, fine physicians in their field that Dr. Myrick suffers from Multiple Sclerosis.

The issue here solely is, is at the time that she became an active duty member of the Public Health Service, if she intentionally withheld. Now the section I quoted there with respect to the disability manual, very clearly says subsection B of Chapter 2, "to be eligible for disability benefits, an officer found unfit because of disability, must have required such disability while on active duty." Now, clearly the other parts of that is, is that with respect to the section I cite is it can incur while in active duty or there is a presumption that if you had it prior to that, the court has to make a determination whether or not at the time she submitted

her application, she lied basically. And I think the evidence here is that Dr. Myrick has clearly stated that she was asymptomatic. Dr. Wolf has clearly stated my wife has told me that the condition wax and wanes. And may show itself at different phases. Here we clearly know that Dr. Myrick was an exceptionally talented, not only dentist, extremely committed to her profession and physically able to pass tests as recent as 2005, at virtually the highest level of participation.

And I say that because at the time she signed the application and Dr. Wolf's concern is whether or not she didn't know that was a medical condition, she stated that she just did not believe that it existed, it was not there. Self-denial you may call that. It is not a basis to say that someone intentionally lied or failed to disclose.

And on the basis of that and the record presented, we find and we think we found that the record does not show that she willfully and wrongfully and deliberately failed to disclose an existing condition to the Board. And as a result of that this Board should find that she should be entitled to a medical disability based upon the medical records and evaluation that is before the Board.

Thank you.

CAPT BAINE: Counsel, would you like to make any additional closing statement?

MR. LONG: No, Your Honor. No.

CAPT BAINE: Are there any more witnesses to be heard?

MR. ROBINSON: There are none.

CAPT BAINE: We will now adjourn this hearing so the Board can conduct it's deliberations in this case and report the Board's findings and recommendations in writing to the acting Surgeon General.

Counselors and LCDR Myrick will be notified in writing of the acting Surgeon General's decision in this case.

This hearing is now adjourned and the time is 10:25 a.m.

MR. ROBINSON: Thank you very much.

Dr. Myrick, we will call you back.

---

CAPT William B. Baine, President
Full and Fair Hearing, Medical Appeals Board
December 6, 2007

REPORTER'S CERTIFICATE

This is to certify that the attached proceedings before:

**HEALTH AND HUMAN SERVICES**

**FULL AND FAIR HEARING APPEALS BOARD**

In the Matter of:

**LCMDR SHARON L. MYRICK**

were held as herein appears and that this is the original transcript thereof for the file of the Department, Commission, Board, Administrative Law Judge or the Agency.

Further, I am neither counsel for or related to any party to the above proceedings.

E. Francis Donovan
Official Reporter

Dated: December 10, 2007

# INNER OFFICE NOTE TO MEDICAL AFFAIRS BRANCH

I spoke with LCDR Myrick by telephone on the evening of 19 September 2007. I told her I had reviewed her records and they were still not complete. I needed to complete records from both her neurologists, Dr. Uskavitch and Dr. Mintz. She states that I already had Dr. Mintz's records and I told her I did not appear to have the records in at least a complete form. I requested to speak with the doctor and I informed her that she needed to provide that permission. I also explained that I received a 2 line letter from her other neurologist, Dr Uskavitch as his complete submission. I informed her that I need all his records and that I need to speak with him about her condition and care. I told her that I called Dr. Uskavitch's office to explain that I needed all the records and not a 2 line letter. The staff told me that this is all the husband authorized. I told the officer that I found this troubling because MAB has been clear in our direction to provide all records. She told me that the staff of Dr. Uskavitch's office accused me of being obnoxious when I talked to them (I certainly was not).

I directed the officer to call both providers and to give them a release of information for all their records and to allow me to speak with them. She was upset and told me she would call me back. I also told her I needed Dr. Mintz's contact information.

Addendum:

As of 24 September 2007 the officer has not called me back to tell me she has given the consent I directed her to provide

Addendum

The officer never called me back.

PRECEPT OF DECEMBER 6, 2008 MEDICAL APPEAL BOARD

DEPARTMENT OF HEALTH AND HUMAN SERVICES

Program Support Center
Enterprise Support Services

**Precept for Medical Appeal Board**
**In the case of**
**LCDR Sharon Myrick**
**06 December 2007**

Date of Birth: [redacted]
Category: Dental
Call to Active Duty: 21 March 2005
Retirement Credit Date: 29 March 2000
Service in another Uniformed Service: US Navy (September 1985- September 1988)
PHS Service Record:
10/22/96-10/29/98 IHS, with inactivation from the Reserve Corps on 10/29/98
3/21/05 Call to Active Duty, HRSA

**Background:**

A FFD has been requested by the officer due to a need for considerable sick leave, physician advice that she can not work a full time job due to her health, and her inability to maintain the standards her position requires. The duty station has also requested a fitness for duty for similar reasons. The officer is currently in her probationary period because she has not yet served the necessary 3 years in this tour of duty. Due to prior service in the Navy and PHS her retirement credit date is 29 March 2000.

The narrative below will present the case information as it was submitted by the officer and the determinations of the Medical Review Boards based on the information they had available.

The officer was evaluated on 16 March 2007 by the neurology department at Cornell for her multiple sclerosis. The history is obtained that in 2005 the officer was active with daily swimming and salsa dancing. She then started to have paresthesias in both feet with a sensation of cold in the first 3 toes on the right side of her foot. Then the sensation would come and go in both feet. This continued intermittently for about 4 months. Then she moved to Washington DC (This move to Washington coincides with her call to active duty (her duty station was in HRSA in the Parklawn Building)) and increased her walking and she noticed it started to become harder to balance. In June 2006 she moved to NYC and got married. Motrin helped the sensations in her feet. She reported that she always had right knee pain and she attributed it to arthritis but this worsened and she eventually stopped dancing. At about this time she started to develop tingling in her left fingers. In October 2006 she saw a podiatrist for what she thought was a neuroma. She was given Marcain injections which would numb her foot for 3 weeks. The area of numbness and paresthesias increased up her foot. She would experience stiffening of her legs which would come and go with a sensation of buzzing up her leg. She eventually stopped dancing. Her toes have stayed constantly numb. Her legs have become unsteady and she can not wear heels. She takes 800-1200 mg of Motrin per day for

knee pain. She has also noticed that she drops things from both hands. She has slight shoulder and neck pain. Although she saw an orthopedist for her knee and underwent physical therapy her symptoms persisted. An MRI of the knee was done and this was normal. At this point it was suggested she see a neurologist. Her current medications include Maxide 1 tab daily, Motrin, KCL. She has a past history of E coli urinary sepsis requiring IV antibiotics and an ectopic pregnancy.

The review of systems at this evaluation was positive for right ptosis for 4 years with blurred vision in the right eye and intermittent blurred vision in the left eye. (There was no history provided of any previous diagnosis of multiple sclerosis nor was there any history given of weekly treatment with Avonex.)

Her physical performed at Cornell was positive for myelopathic signs and she was given the diagnosis of an unspecified demyelinating disease of the central nervous system. Her CSF drawn as part of that evaluation contained oligoclonal bands that are not present in her serum indicating an abnormal synthesis of IgG in the CSF. This was considered to be supportive evidence for multiple sclerosis.

An MRI of the cervical spine was performed to evaluate her extremity numbness. Degenerative disk disease was noted at C5-6 and C6-7 with right sided foraminal encroachment at C6-7. Foci of abnormal hyper-intense signal were seen in the cervical cord and are consistent with foci of demyelination.

An MRI of the brain was performed and showed demyelinating disease. One area of acute demyelination was noted.

**Officer Statement**

See attached

**Supervisor Statement:**

The officer has been on extended sick leave since March 2007 when she was diagnosed with MS. The supervisor and duty station have been supportive of the officer and they support the request for medical retirement.

**Medical Review Board (MRB) Recommendation 30 August 2007:**

USPHS Medical Review Board (MRB) convened on 30 August 2007 and reviewed all pertinent past records and the officer's statement and the MRB decided to defer the decision regarding fitness for duty and disability determination due to the need for more information. The officer has the medical condition of Multiple Sclerosis (MS). The fitness for duty evaluation was initiated by the officer citing fatigue and an inability to maintain basic readiness and be deployed. Due to incomplete information, the officer is directed by the Medical Review Board to contact ALL her medical and mental health providers where she received care from

January 1 2007 through to the present, provide a release of information for these records to her providers, submit a copy of these release forms to MAB, and arrange for these records to be sent directly from the providers to the Medical Affairs Branch. All medical records generated between January 1 2007 and the time of her next Board.evaluation must be submitted for an accurate determination.

**Officer Statement since 30 August MRB**

See attached

**Records Submitted or Reviewed after 30 August MRB and before the 27 Sept MRB**

A medical record submitted to Tricare by Dr. Uskavitch's office on 28 August 2007 was reviewed by the Tricare Point of Contact in MAB on 14 September 2007. This was referred to the Senior Medical Evaluations Officer as a potential fitness for duty concern in an active duty officer. This record is a request by the doctor's office for approval to treat the officer's MS with Tysabri every 4 weeks. The medical history is given that the officer had a diagnosis of MS since November 2000 when she was 42 years of age. It states that she has been treated with Avonex 30 mcg/wk from January 2001 through August 2007. It also included a copy of the doctor's clinic note from 23 August 2007 and from 9 August 2007.

The neurology clinic note from 23 August 2007 (Dr. Uskavitch) states that the officer is having neuropathic central pain in the lower extremities which has been of moderate severity and chronic. The review of systems indicated variable leg stiffness. She denied weakness. She also denied depression and anxiety. The past medical history lists MS, two ectopic pregnancies, hypertension, a concussion in 2000, cervical precancerous cells noted in 1983 and right eyelid droop. Her medications at this visit include Lipitor 10 mg daily, Maxide 50 mg daily, Cymbalta 50 mg daily, KCL, L-5 methyl tetrahydrofolate tid, Magnesium lactate tid, calcium daily, vitamins, minerals and herbal formulations. Her neurologic and psychiatric exam showed hyper-reflexic lower extremities with normal coordination and mildly spastic gait. Her affect was described as appropriate and she did not appear to be depressed anxious, or agitated. The impression was MS with breakthrough disease both clinically and by MRI. It is noted that she is on interferon beta treatment (Avonex) im weekly. The decision to switch to Tysabri is discussed and to discontinue the Avonex. Lower extremity arterial Doppler studies are pending. A trial of Lyrica 75 mg BID was begun for her central pain. The neurologic and psychiatric exam showed the mildly spastic gait and lower extremity hyper-reflexia. She was described to have appropriate affect with no depression, anxiety, or agitation. Switching to Tysabri was discussed. The plan was to discontinue the Avonex.

The neurology clinic note from Dr. Uskavitch dated 9 August 2007 lists a chief complaint of paresthesias and stiffness. Moderate chronic myelopathic pain in the lower extremities is noted. A brain MRI showed multiple periventricular demyelinating lesions with a right parietal diffusion abnormality consistent with an acute demyelinating lesion. The cervical spine MRI showed a focal cervical demyelinating plaque. Interferon neutralizing antibodies were negative. The officer denied depression or anxiety. The impression was multiple sclerosis with significant breakthrough disease on long term interferon beta 1 a therapy (Avonex).

A letter dated 10 September 2007 was submitted containing 2 sentences by Dr. Uskavitch, a neurologist at Vanderbilt, stating that she will soon be treated with Tysabri. No medical records were submitted with this letter. The Medical Affairs Branch clearly directed the officer to have all her providers submit all their medical records over the past year to this office. The Senior Medical Evaluations Officer (SMEO) telephoned the doctors office to ask what the consent authorized and it only authorized the brief letter according to the doctor's nurse. The SMEO then telephoned the officer to again explain that we need all the medical records. To date the medical records have not arrived. The officer did leave a voice mail message stating that they decided not to go forward with the Tysabri treatment and that they will be switching care back to Dr Mintz at Columbia.

A letter dated 8 September 2007 from an acupuncturist states that they began treatment on 7 August 2007 for the officer's bilateral pedal neuropathic pain and her stiffness. The perception of continuous numbness was thought to be secondary to the MS. One treatment exacerbated her pedal paresthesias but other treatments diminished it.

A letter was submitted by a chiropractor dated 6 September 2007 which states that the officer was seen for paresthesias in her hands, knees, and feet. She has a sensation of feeling unsteady on her feet. The exam was noted to be unremarkable with 4-5/5 strength is all tested muscle groups. Her grip in both hands was normal at 40 pounds. She had a wobbly gait with normal Rhomberg and finger to nose.

A letter from a psychiatrist dated 20 June 2007 states that she was referred to evaluate her mental health as it relates to her recent diagnosis of MS in 2006. At the time of the letter they had met 4 times. Since the diagnosis of MS the officer has felt overwhelmed and unable to function at her usual high level. She has also had difficulty concentrating with depressed mood. These difficulties persist despite being on an antidepressant for several months. The mental exam on 20 June 2007 showed a depressed mood, sad affect, difficulty concentrating, diminished appetite, lack of interest in usual activities, feeling of worthlessness and hopelessness, mild insomnia. There was no psychosis or suicidal thought. The officer has the diagnosis of mental disorder NOS due to her MS. She is on Cymbalta 90 mg per day.

A fax presumably from Dr. Mintz from WestSide Internal Medical Associates contained a progress note dated 13 April 2007 from Mount Sinai Medical Associates that gives a history of toes tingling in March 2006 after a lot of dancing. There was also a history of tingling in her fingers. It is noted that she received foot injections. She was diagnosed with MS by another neurologist (but it does not state when or give any details). IV steroids were used one month previously for her MS and at that time she had slurred speech. Her feet are noted to have a burning sensation and her knees hurt. The officer gives the history that she feels her right leg is weak. The neurologic exam was normal except for a slightly unsteady gait. Cymbalta was started for neuropathic pain. On 4/27 her legs are noted to be stiffer. Her strength was normal. She thinks she is worse on the Cymbalta. Baclofen was tried. It is noted that the officer is depressed and antidepressants were considered. She was seen again on 5/11. It is noted the legs are less stiff. Her tone is improved. She is described as depressed and still complaining of tingling. It is noted that the Avonex is being continued because the patient really wants it. She

was seen again on 5/25 and it is noted that she is very bothered by the tingling in both feet and fingers. The Cymbalta was increased to try to improve the tingling. She was seen again on 15 June. Increasing the Cymbalta to 90 made no difference with the tingling. The Baclofen also does not seem to be helping. The Cymbalta was decreased to 60 and Gabapentin was started.

The record contains a letter from Dr. Pruzansky to Dr. Beverly. This is an orthopedic consultation. The officer gave the history of bilateral knee pain for 30 years and she was diagnosed with bilateral patella tracking disorder at this visit

The officer saw a sports medicine physician on 26 Oct 2006 for bilateral knee pain. The history is noted that she was told during adolescence that she had arthritis in her knees. The assessment was anterior knee pain syndrome and subtalar joint dysfunction. An MRI of the right knee was unremarkable other than a small joint effusion.

Clinic notes from 9/21/06 and 8/10/06 from the officer's internist, Dr. Beverly, make no mention of MS or MS symptoms. She was seen on 12/7/06 and it is noted she is scheduled for surgery on her toe on the 14th of December and she was referred to an orthopedic surgeon by the name of Dr. Hamilton for a second opinion. On 3/26/07, a note states she had surgery on her right great toe in December 2006 (these records have not been submitted by the officer). Two weeks earlier she consulted with a specialist in MS (Dr. Apatoff) because of tingling in her knee and toes. She was treated with prednisone and she thinks she is dragging her right foot. The exam showed decreased strength in the right foot with decreased sensation in both feet. The assessment was MS. The doctor provided the officer with a note stating she is unable to work because she has difficulty climbing subway stairs. A referral was made to Dr. Mintz. She was seen on 4/9/07 for burning sensation in both feet. She states she does not think she responded to the prednisone. It is noted the patient is to remain out of work pending further evaluation by Dr. Mintz. On 4/16/07 it is noted that she saw Dr. Mintz and Cymbalta was started. On 4/23 she still has foot numbness and it is noted that Cymbalta was started and that she is depressed about her recent illness. It is noted that she is referred to a Dr. Powell (psychiatrist). On 5/10/07 she still has paresthesias in both feet and hands. The pain in her legs increases with walking and is partially relieved with rest. On 5/31/07 she still complains of numbness in both feet and pain in the right 5th toe and she states there has been no significant improvement with physical therapy. CTA of the abdomen showed aortic athersclerosis without dilatation and CTA of the lower extremities showed an occluded right anterior tibial artery in the mid calf. The officer was referred to a Dr. Green for the peripheral vascular issues. On 6/8/07 she reports no improvement in the numbness of her feet. It is noted that Dr. Green (Dr. Green's records were not submitted) did not believe peripheral arterial disease was the cause of her symptoms.

**Medical Review Board Recommendation 27 September 2007**

USPHS Medical Review Board (MRB) convened on 27 September 2007 and reviewed all pertinent past medical records and the officer's statement and determined that the officer is considered unfit for duty. The officer is unable to perform the duties of her rank, category, and billet. This officer was recommended for separation since the onset of the condition of

Multiple Sclerosis was prior to her call to active duty. This information was not disclosed as is required at the time of her application and call to active duty. In addition, the officer did not disclose other significant chronic conditions such as knee pain. At the time of her application she withheld information which would have established the preexistence of the disabling condition. This pre-existing condition was not aggravated by her service and her exacerbation was considered to be a natural progression of her disease. The disabling condition of Multiple Sclerosis therefore is not service related. The officer did not comply with the Medical Affairs Branch directive to allow her neurologists to speak with the Senior Medical Evaluations Officer about her medical condition and she failed to provide all the medical records she was directed to provide. The fitness for duty evaluation was initiated by both the duty station and the officer citing an inability to come to work.

| VASRD# | Rating |
|---|---|
| 8018 Multiple Scleosis | 0% |
| 5257 Knee impairment | 0% |
| Total Present Combined Disability | 0% |

The officer elected to appeal the findings of the Medical review Board.

**Officer's Statement of Appeal**

The officer submitted a statement of appeal through her attorney. The statement lists 12 points (see attached).

**Medical Records Submitted after MRB 27 September 2007**

The medical records from Dr. Uskavitch's office were submitted as directed. They included the following 3 documents.

A neurology consultation dated 27 November 2000 by Dr. Duncan gives the history that the patient was recently experiencing slurred speech. There were no other neurologic symptoms noted. During the exam she was noted to have a dysarthria with hesitancy of speech and difficulty with labial sounds. There was a slight increase with reflexes on the left. An MRI done in the previous week was reviewed by Dr. Duncan and it showed six edematous spots which were peri-ventricular and noted to radiate perpendicularly from the ventricular wall. The impression was dysarthria most likely secondary to multiple sclerosis. The patient was also noted to have a congenital right ptosis and a congenital right papillary afferent defect. The plan was to perform a lumbar puncture.

A clinic visit dated 31 March 2004 with Dr. Uskavitch gives the patient a diagnosis of Multiple Sclerosis. With this note Dr. Uskavitch has assumed patient care from Dr. Duncan. The neurologic records to date were reviewed. It is noted they showed she had her initial demyelinating event in November 2000 with dysarthria, 6 MRI demyelinating lesions, and

positive oligoclonal bands in the CSF. It is documented that she has been on Avonex for the past 3 years and has had no recurrent relapses or symptoms of disease progression. The plan was to continue the Avonex 30 mcg weekly and to repeat an MRI. The MRI was performed on 9 April 2004 and showed numerous periventricular and subcortical white matter lesions consistent with demyelinating disease.

A neurology clinic visit from 10 April 2006 lists the diagnosis as MS. It is noted that for the past couple of years she has had variable numbness in her toes and that she continues with her therapy with Avonex. She denies significant functional impairment. She had brisk patellar reflexes and normal gait. At this visit there was no evidence for progression of her MS.

**Issues:**

The Medical Appeals Board's task is to review and evaluate the evidence presented and determine the officer's fitness for duty. If the officer is found to be not fit for duty then each medical condition that makes her unfit needs to be reviewed regarding whether it is service related or whether it began while on active duty. In order for an officer to be eligible for disability benefits, the medical condition causing the disability must have occurred while the officer was on active duty. If the Board determines the condition is not service related or aggravated then the officer is not entitled to disability benefits. The Board generally would also determine if any pre-existing condition (disclosed at the time of accession) was significantly aggravated by service; the natural progression of a disease is not considered service aggravation. Any ratable service related conditions would then need to be given a disability rating based on the VA Disability Manual. The Board would then need to determine if the officer should be separated without benefits, separated with severance pay, placed on temporary medical retirement (TDRL), or permanently retired. The Board may consider discussion and addition of other pertinent items as part of their recommendation to the Acting Surgeon General. Please refer to CCPM 47 included for your reference.

NOTICE OF APPEARANCE OF ATTORNEYS
FOR LCDR SHARON L. MYRICK

**Department of Health and Human Services**
**Medical Affairs Branch**
**Office of Commissioned Corps Support Services**
**5600 Fishers Lane, Room 4C-04**
**Rockville, Md. 20857-0001**

In Re: Sharon L. Myrick, DDS. :

## Notice of Appearance Of Attorneys

Comes now Sharon L. Myrick, DDS, (Myrick), and advises the Medical Affairs Branch as follows:

1. The Medical Affairs Branch will please note the appearance of Attorneys: Leonard L.Long, Jr, and Wendell C. Robinson, as Myrick's attorneys for all matters pending before this branch, including the hearing set for December 6, 2007.

Respectfully submitted,

Leonard L.Long, Jr,
1818 11th St. N.W.
Washington, D.C. 20001
202-234-5664

Wendell C. Robinson
4308 Georgia Avenue, N.W.
Washington, D.C. 20011
202-223-4470

**Department of Health and Human Services**
**Medical Affairs Branch**
**Office of Commissioned Corps Support Services**
**5600 Fishers Lane, Room 4C-04**
**Rockville, Md. 20857-0001**

In Re: Sharon L. Myrick, DDS. :

## Exceptions to Medical Review Board Report

Comes now Sharon L. Myrick, DDS (Myrick), by and through undersigned counsel, and appeals the Medical Review Board's findings and states:

1. The Medical Review Board's Findings, dated, October 16, 2007, **Attachment # 1**, that Myrick is not fit for duty, is not supported by substantial evidence, and Myrick demands substantial evidence to support the Medical Review Board's Findings, on that issue.

2. The Medical Review Board's Finding(s), dated, October 16, 2007, **Id**, that Myrick was not fit for day, is invalid, because her fitness for duty was improperly before the Medical Review Board; and Myrick demands substantial evidence that said issue was properly before the Medical Review Board.

3. The Medical Review Board's Finding(s), dated, October 16, 2007, **Id,** that Myrick should be separated, without a medical disability, is not supported by substantial evidence, and Myrick demands substantial evidence to support the Medical Review Board's Findings, on that issue.

4. The Medical Review Board's Findings, dated, October 16, 2007, that Myrick failed to disclose, at the time of her employment, a preexisting medical condition is not support with substantial evidence; and Myrick demands substantial evidence to support the Medical Review Board's Findings, on that issue.

5. The Medical Review Board's Findings, dated, October 16, 2007, that Myrick was not fit for duty is moot, and was improperly before he Medical Review Board, because on June 15, 2007, Myrick informed Ron Moss, Division Director, Region II, that she was resigning her position for medical reasons. **<u>Attachment # 2</u>**.

6. The Medical Review Board's Findings, dated, October 16, 2007, that Myrick failed to disclose the existence of a disabling condition, prior to her call to active duty, **<u>Id.</u>**, lacks substantial evidence to support that finding and; Myrick demands substantial evidence that it was a condition of her employment, with HHS, to disclose any preexisting disabling condition(s), and demands substantial evidence that she failed to comply with any such requirement.

7. The Medical Review Board's Findings, dated, October 16, 2007, that Myrick failed to disclose the existence of a disabling condition, prior to her call to active duty, **<u>Id.</u>**, lacks substantial evidence to support that finding and; Myrick demands substantial evidence that it was a condition of call to active duty, to disclose any preexisting disabling condition(s) and demands substantial evidence that she failed to comply with any such requirement.

8. The Medical Review Board's Findings, dated, October 16, 2007, that Myrick failed to disclose the existence of other significant chronic conditions, such as knee pain, prior to her call to active duty, **<u>Id.</u>**, lacks substantial evidence to support that finding and; Myrick demands substantial evidence that it was a condition of her employment, with HHS, to disclose any preexisting disabling condition(s), prior to her call to active duty, and demands substantial evidence that she failed to comply with that requirement.

9. The Medical Review Board's Findings, dated, October 16, 2007, that Myrick withheld information which would have established the preexistence of the disabling condition(s); and demands substantial evidence to support that allegation.

10. The Medical Review Board's Findings, dated, October 16, 2007, that Myrick refused to allow the Medical Affairs Branch to speak to her neurologists, lacks substantial evidence to support that finding and; Myrick demands substantial evidence to support it.

11. The Medical Review Board's Findings, dated, October 16, 2007, that Myrick's Medical Disability was not aggravated by her service, lacks substantial evidence to support that finding and; Myrick demands substantial evidence to support that allegation.

12. The Medical Review Board's Findings, dated, October 16, 2007, that Myrick's Medical Disability was not aggravated by her service, but a natural progression of the disease, lacks substantial evidence to support that finding and; Myrick demands substantial evidence to support that allegation.

Respectfully submitted,

Leonard L.Long, Jr,
1818 11th St. N.W.
Washington, D.C. 20001
202-234-5664

Wendell C. Robinson
4308 Georgia Avenue, N.W.
Washington, D.C. 20011
202-223-4470